# Supreme Court of Florida

————————

No. SC14-1317
————————

**DONTAE MORRIS,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[April 27, 2017]

PER CURIAM.

Dontae Morris appeals his convictions of first-degree murder and his sentences of death.[1] For the following reasons, we affirm the convictions and sentences.

## I. Background

Morris was convicted and sentenced to death on two counts for the first-degree premeditated murders of Officer David Curtis and Officer Jeffrey Kocab. The evidence at trial established that on June 29, 2010, at about 2:13 a.m., Officer

————————

1. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.

Curtis pulled over a red Toyota Camry in Hillsborough County for not displaying an automobile tag. Cortnee Brantley was the driver, and Dontae Morris was in the passenger's seat. The dashcam video from Officer Curtis' patrol car was played for the jury at trial. The transcript of that video includes a discussion in which Morris identifies himself to Officer Curtis, disclosing his name, age, and birthdate. The transcript continues with a discussion between Officer Curtis and Ms. Brantley about the missing tag on the vehicle, and Ms. Brantley states that the tag was stolen.

Officer Curtis returned to his patrol car, entered Morris' name in his in-car computer, and discovered that there was a warrant out for Morris. He called for backup, and Officer Kocab pulled up and parked behind Officer Curtis' parked patrol car. Then both officers approached the passenger side of the parked Camry. Officer Curtis, with Officer Kocab standing right behind him at the passenger side of the vehicle, asked Morris to exit the vehicle. Morris exited the vehicle as if he was surrendering but instead grabbed a gun and shot both officers in the head. The approximate time for the homicides of Officers Curtis and Kocab was 2:18 a.m. This interaction is captured in the dashcam video in the following way:

> [Officer Curtis]: —you know anything about it?
> [The Defendant]: The warrant?
> [Officer Curtis]: Yeah.
> [The Defendant]: I ain't got no warrant.
> [Officer Curtis]: Okay. Step over here. Turn around and step and put your hands behind your back.

(Shots fired.)
[Ms. Brantley]: Baby—Babe.

The remaining portion of the video captures panicking individuals tending to the injured officers and performing CPR. Both officers were transported to Tampa General Hospital where they were later pronounced dead. The officers' autopsies confirmed that both officers died of fatal gunshot wounds to the head. Furthermore, an expert in the field of firearms analysis and identification concluded that both of the projectiles removed from the bodies of Officer Curtis and Officer Kocab were fired from the same firearm.

Immediately following the shooting, Morris fled the scene, running on foot northbound. Four days after the homicides, Morris turned himself in.

On the front seat of Officer Curtis' patrol vehicle, detectives found Officer Curtis' notepad and Cortnee Brantley's driver's license. On the notepad, Officer Curtis had noted the name and birthdate of the passenger as it was provided to him when he asked the passenger to identify himself. Additionally, in Officer Curtis' car, the mobile dispatch terminal, or in-car computer, indicated Dontae Morris' name, his identifying information, and a photograph of him. Morris' birth certificate was entered into evidence and matched the name and birthdate that the passenger of the Camry in the dashcam video provided to Officer Curtis.

Temika Jones testified that she saw Morris, whom she knew as "Quelo," on the day of the murders in the morning. She remembered that he was wearing a

dark blue vest with a white shirt underneath, dark khaki shorts, and white sneakers or tennis shoes. Ms. Jones also testified that Morris called her around 2 a.m. Later that day, detectives interviewed Ms. Jones. When the detectives showed her a photograph, which was a still photo from the dashcam video, she identified the individual in the photo as Morris. She testified that it looked like Morris because of the head shape and outfit and because he had on the same clothing that he had on that morning when she saw him.

Additionally, two witnesses testified that they saw a black male running northbound from the scene of the incident. Ynalia Keen lived in a bottom floor apartment near where the traffic stop took place. She testified that on the night of the incident, she had stepped out of her apartment to get snacks from a gas station, and, when she heard the gunshots, she rushed back inside. From inside her apartment, looking through a front window that looks out onto the street, she saw a black male running on the sidewalk towards her apartment building, then into the apartment complex, cutting through the middle of the parking lot, and jumping a small fence. When she could not see him through the front window, Ms. Keen went to the kitchen to look through the window at the back of the apartment, where she saw him jump another, taller, chain-link fence.

The next day, on June 30th, Detective Charles Massucci interviewed Ms. Keen. Ms. Keen identified Morris' photograph from a photographic lineup. Ms.

Keen also wrote the following statement: "Seen him on the back road with a group of people. He had ran by my house when the people was shot. Seen him at the Shell store."

The other witness, Alfred Thompson, was walking northbound on the street where the traffic stop took place. As he walked past the Camry, he noticed that the car had two occupants sitting in the front seat, a black female in the driver's side and a black male in the passenger's side. He also saw the officer in his vehicle at that time. After Mr. Thompson passed the cars, he heard two gunshots coming from behind him from the direction of the police car and the other vehicle, and he hid behind another car; he did not see the individual who fired the shots. Thereafter, Mr. Thompson saw a black male run northbound (on the same sidewalk he was walking on), go through an apartment complex, and jump a chain-link fence.

Just north of the crime scene, detectives found footprints on the bottom part of the large fence at the perimeter at the back of the apartment complex and also found a piece of a zipper that was torn off from an article of clothing attached to the top of that fence.

On the night of the murders, Morris called Ashley Price and confided in her regarding the murders. Ms. Price went to the Tampa Police Department on June 30, the next day, and spoke with Officer Kevin Durkin. She testified that she knew

Morris as "Quelo" and that Morris called her more than once in the early morning hours of June 29. When she answered a call from Morris around 3:30 a.m., he asked for a ride, but she did not give him one. She spoke with him on the phone again at around noon that day, and Morris told Ms. Price "that he did it," telling her to watch the news about the police officers. Ms. Price also testified that Morris told her the following: that he shot the officers to get away from them, that he was out of the car when he shot the officers, that there were two officers, that he shot them in the head, that he referred to them as "crackers," that he got the gun from under the seat, that he gave the officer his name, that the officer had gone back to run his name, that he was afraid that he had a warrant, that he was the passenger in the car, and that he was going to try to go to Jacksonville.

Detective Charles Massucci confirmed that between the time of the murders and the afternoon of June 30, there were no releases from the Tampa Police Department about the facts of the case to the press or to the media concerning this subject matter that Ms. Price discussed.

The red Toyota Camry was located at an apartment complex on the morning of June 29, the same day as the crime, roughly nine-and-a-half hours after the crime itself. This apartment complex was located about 2.8 miles from the crime scene. The building in which Ms. Brantley, the driver, was located was about 500 yards from where the Camry was parked. Pursuant to a search warrant, the red

- 6 -

Camry was seized and searched. DNA analysis showed the blood found on the exterior passenger side rear door matched that of Officer Curtis.

Ms. Brantley was escorted to Tampa Police Department headquarters and was interviewed. During the approximately six-and-a-half hour interview, detectives asked Ms. Brantley more than once to identify the front seat passenger in the Camry during the stop, but she never identified him.

Additionally, cell phone records were presented at trial for cell phones associated with Morris and Ms. Brantley. Based on testimony regarding the cell records, cell towers, mapping, and diagrams, the cell phone use placed Morris and Ms. Brantley at or near the scene of the crime at the time of the incident. And the testimony revealed phone calls made in the minutes before and after the murders of the two officers from the cell phone associated with Morris.

Following the State's case, the defense rested without presenting any evidence or witnesses. Thereafter, the jury returned guilty verdicts for two counts of first-degree premeditated murder and one count of escape while being transported.

At the penalty phase, the State presented evidence that, on March 13, 2013, Morris was convicted of the first-degree murder and attempted robbery with a firearm of Rodney Jones and that Morris had been sentenced to life in prison without the possibility of parole for that conviction. The State also presented four

victim impact statements from family members of Officers Curtis and Kocab. In mitigation, Morris presented the testimony of his mother, two cousins, and his aunt. On November 19, 2013, the jury recommended the death penalty by a vote of twelve to zero on both counts.

At the subsequent Spencer[2] hearing, the defense presented mental health mitigation with expert testimony from Dr. Valerie McClain, an expert in forensic psychology and neuropsychology. Dr. McClain reviewed Morris' prior mental health records from Dr. Lamar Ingulli, which included memory testing and IQ testing. Dr. McClain diagnosed Morris with major depression with psychotic features and borderline intellectual functioning but not intellectually disabled. She testified that Morris had deficiencies in verbal comprehension, such as word knowledge and processing speed.

Then the State presented rebuttal mental health expert testimony and additional victim impact testimony. Dr. Emily E. Lazarou, an expert in the area of forensic psychiatry, testified that she reviewed Dr. McClain's depositions, Dr. Ingulli's medical records, and Morris' school records, and opined that Morris was in the average range of intellectual functioning with an IQ of at least 100 to 110.

---

2. Spencer v. State, 615 So. 2d 688 (Fla. 1993).

Thereafter, the trial court sentenced Morris to death in accordance with the jury's unanimous recommendations on both counts. In so doing, the trial court found the following aggravators were proved as to each count beyond a reasonable doubt: (1) the defendant was previously convicted of another capital felony or of a felony involving the use or threat of use of violence to a person (great weight); (2) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody (did not weigh or consider because merged with law enforcement officer aggravator); and (3) the victim of the capital felony was a law enforcement officer engaged in the performance of his official duties (great weight).

The trial court also found the following mitigators: (1) Morris was prematurely born to a sixteen-year-old, unwed mother (minimal weight); (2) Morris' father was murdered when he was two years old (no weight); (3) Morris was raised by his maternal grandmother during his early years, but her health was fragile and she could not and did not adequately care for him (minimal weight); (4) Morris' mother did not bond with her child because she suffered severe postpartum depression and was a child herself (moderate weight); (5) Morris started to bond with his step-grandfather, but he became a crack addict and left the family (minimal weight); (6) Morris was raised without a father or any other male role model (moderate weight); (7) Morris' mother subsequently gave birth to two more

children, and she eventually married their father (minimal weight); (8) Morris' mother attempted to make a home with a supportive family (minimal weight); (9) Morris' mother grew tired of the limited success of her efforts to integrate Morris into her new family, and Morris felt more and more isolated, alone, rejected, and left out (minimal weight); (10) Morris had to watch his siblings receive support and affection of a father, support he never had (minimal weight); (11) fourteen-year-old Morris assumed the role of man of the house and source of support for his siblings when his mother left her husband, and Morris suffered with his mother through a long and bitter divorce (minimal weight); (12) after the divorce, the family moved in with another man, and he and Morris competed for the role of man of the house and father to his siblings, and Morris was asked to leave the home (moderate weight); (13) the family conflict was encouraged by Morris' former stepfather, who undermined and sabotaged the discipline of Morris and his siblings (moderate weight); (14) Morris lived for a period of time with his paternal grandparents, but they failed to control or discipline him, and he showed signs of deteriorating school work and social and behavioral turmoil (minimal weight); (15) Morris was close to his aunt and his cousins, who were positive influences and a healthy support system for him, but they moved during the time of his family's turmoil (minimal weight); (16) Morris' early teen years were unstable, and he was uprooted multiple times, attending five different schools and living in various

relatives' homes over a two-year period (minimal weight); (17) when Morris became involved in the juvenile justice system, his mother obtained counseling for him, and she also petitioned juvenile authorities and the court system to get more stringent treatment programs for him (moderate weight); (18) his mother's requests were refused, and she was told Morris' offenses were not serious enough, and he got no meaningful help or guidance during this critical juncture in his development (moderate weight); (19) Morris has maintained a supportive relationship with his child (moderate weight); (20) Morris has maintained a caring and supportive relationship with his cousins and other family members even while in jail (minimal weight); (21) Morris has expressed remorse for killing (minimal weight); and (22) the above circumstances cumulatively established general mitigating evidence that provides reasons the death penalty is not appropriate (moderate weight).

## II. Analysis

### A. Motion to Strike Jury Panel

Morris first argues that the trial court erred in denying Morris' motion to strike the jury panel based on statements made by a prospective juror, Juror K, during jury selection.[3] However, we conclude that the trial court did not err.

---

3. This prospective juror was eventually stricken for cause.

The denial of a motion to strike the jury panel is reviewed for abuse of discretion. Williams v. Osking, 105 So. 3d 653, 655 (Fla. 4th DCA 2013). "In order for the statement of one venire member to taint the panel, the venire member must mention facts that would not otherwise be presented to the jury." Johnson v. State, 903 So. 2d 888, 897 (Fla. 2005). Additionally, "[a] venire member's expression of an opinion before the entire panel is not normally considered sufficient to taint the remainder of the panel." Id.

In this case, the trial court did not abuse its discretion. First, Juror K's statements uttered before the other potential jurors did not reveal any knowledge she may have had regarding Morris previously being indicted for and convicted of another murder. Her comments, including the terms "another performance" and "repeat performance," seem to allude to her view that if the defendant was already convicted during the first proceeding, the guilt phase, for first-degree murder, that doing "another performance" of a second proceeding, the penalty phase, would be "wasting taxpayer's money." And the State's follow-up question seems to suggest that the prosecutor was interpreting her responses in this way since he explained that different evidence would be presented at the penalty phase (i.e., "evidence of aggravation"). Additionally, neither the prosecutor nor the prospective juror mentioned Morris, and the prospective juror did not reveal any knowledge she had

- 12 -

about the defendant.  Instead, the exchange reflects only a hypothetical discussion about a possible waste of resources with multiple proceedings.

It is only when Juror K was brought in and questioned individually without the other jurors present that she revealed that she had knowledge of Morris' other crimes.  When the comments made outside the presence of the jury are combined with the general and hypothetical comments she made in the presence of the jury, it becomes possible that Juror K may have been referring to her knowledge of the other crimes.  However, this discussion took place outside the presence of the jury panel.  Importantly, Juror K did not reveal in the comments she made in the presence of the jury any of her knowledge of other crimes.  Additionally, the questioning of Juror K was promptly stopped before she revealed anything improper.  Cf. Evans v. State, 36 So. 3d 185, 185-86 (Fla. 4th DCA 2010) (reversing and remanding for a new trial because a prospective juror's comments during voir dire that he knew the defendant from his work as a detention deputy at the jail suggested that the defendant had prior criminal charges or convictions).

Accordingly, the record demonstrates that the trial court did not abuse its discretion in denying Morris' motion to strike the entire jury panel.

## B.  Spontaneous Statements While Under Observation in Jail

Next, Morris claims the trial court erred in overruling an objection to the admission of Morris' redacted statement made while he was under observation in

jail.  Specifically, at trial, a corrections deputy testified that on one occasion he came to be in the presence of Morris and that he heard Morris make the following statement:  "I repent for killing."  Morris also claims that the trial court erred in preventing the defense from presenting evidence regarding Morris' mental state at the time he made the statement.  However, we conclude that the trial court did not err in admitting the redacted statement and that any error in preventing the defense from presenting evidence was harmless.

A trial court's ruling on the admissibility of evidence will not be disturbed absent an abuse of discretion.  See Franklin v. State, 965 So. 2d 79, 94 (Fla. 2007).  Under Florida law, all relevant evidence, defined as that tending to prove or disprove a material fact, is admissible unless otherwise provided by law.  See §§ 90.401-90.402, Fla. Stat.  Relevant evidence is inadmissible, however, if the probative value is substantially outweighed by the danger of unfair prejudice.  See § 90.403, Fla. Stat.

An admission of a party opponent is admissible as an exception to the hearsay evidence rule.  § 90.803(18), Fla. Stat.  "In the context of a criminal trial, an admission [by] the defendant is admissible if it tends in some way, when taken together with other facts, to establish guilt."  Swafford v. State, 533 So. 2d 270, 274 (Fla. 1988).  The evidence must "be relevant to a material issue other than

propensity or bad character." Johnston v. State, 863 So. 2d 271, 279 (Fla. 2003) (quoting Drake v. State, 441 So. 2d 1079, 1082 (Fla. 1983)).

In this case, Morris' statement, "I repent for killing," constitutes evidence tending to show that he was involved in the murders. And because the statement was redacted to take out the reference to killing five people, the statement does not tend to show propensity or bad character. Moreover, the probative value of Morris' redacted statement is not substantially outweighed by the danger of unfair prejudice. Accordingly, the trial court did not abuse its discretion in admitting it.

Additionally, Morris argues that the trial court erred in preventing the defense from presenting evidence regarding Morris' mental state at the time he made the statement. Pursuant to the Florida Evidence Code, Morris could offer evidence to dispute the truthfulness of his statement and impeach his admission. See § 90.806(1), Fla. Stat. Specifically, the testimony Morris sought to offer was relevant to the circumstances surrounding his statement, namely his mental state at the time he made the statement, in an attempt to cast doubt on the credibility of the statement that he made. See, e.g., Palmes v. State, 397 So. 2d 648, 653 (Fla. 1981) (defendant's state of mind is relevant to the question of what weight to give the confession in determining guilt). However, any error in excluding evidence of Morris' mental state at the time he made the statement was harmless beyond a reasonable doubt. See State v. DiGuilio, 491 So. 2d 1129, 1138 (Fla. 1986).

- 15 -

## C. Officers' Testimony Regarding Dashcam Videotape

Additionally, Morris claims that the trial court erred in allowing law enforcement officers to give opinions identifying Morris' voice and image from the dashcam videotape. Specifically, Morris argues that, because these witnesses were law enforcement officers, the jury would defer to their opinions. However, we conclude that any possible error was harmless.

"A trial court's decision to admit evidence is reviewed under the abuse of discretion standard." Evans v. State, 177 So. 3d 1219, 1229 (Fla. 2015) (citing Hudson v. State, 992 So. 2d 96, 107 (Fla. 2008)). "In determining whether an error was harmful, the focus is on the effect that the error has upon the trier-of-fact." Gregory v. State, 118 So. 3d 770, 782 (Fla. 2013) (citing Williams v. State, 863 So. 2d 1189, 1190 (Fla. 2003)).

In Evans, 177 So. 3d at 1228, this Court addressed the issue of whether the trial court erred in permitting a law enforcement officer to testify to voice identification and offer his opinion that the voice on a 911 call-back recording was the defendant's. The majority of this Court held that the trial court erred when it admitted Detective Judy's opinion testimony because he did not have prior special familiarity with the voice of the defendant. Id. at 1230-31.

However, in this case, any error in admitting the detectives' testimony identifying Morris' voice and image on the dashcam video was harmless beyond a

reasonable doubt. See DiGuilio, 491 So. 2d at 1138. The video itself revealed Morris' identity, specifically, when Officer Curtis asked him to state and spell his name and asked him for his birthdate and age. This identification was corroborated by Officer Curtis' notepad found on the front seat of his patrol car, listing the identifying information provided by Morris, as well as the search for his name (revealing his warrant) on Officer Curtis' in-car computer. Additionally, Temika Jones testified at trial and identified Morris from a still picture taken from the dashcam video. Accordingly, any error here was harmless.

## D. Ashley Price's Prior Consistent Statements

Morris claims that the trial court erred in allowing Detective Durkin to testify regarding prior consistent statements that Ashley Price made to the detective on the day after the murder because this testimony improperly bolstered Ms. Price's testimony. However, the trial court did not abuse its discretion. See Tumblin v. State, 29 So. 3d 1093, 1100 (Fla. 2010); see also Hudson, 992 So. 2d at 107 (stating that the standard of review of a trial court's decision to admit evidence is abuse of discretion).

" 'Generally, prior consistent statements are inadmissible to corroborate or bolster a witness's trial testimony' because they are usually hearsay, but a prior consistent statement may be admitted as nonhearsay if certain conditions are met." Tumblin, 29 So. 3d at 1100 (quoting Taylor v. State, 855 So. 2d 1, 22 (Fla. 2003)).

Specifically, "prior consistent statements are considered non-hearsay if the following conditions are met: the person who made the prior consistent statement testifies at trial and is subject to cross-examination concerning that statement; and the statement is offered to 'rebut an express or implied charge . . . of improper influence, motive, or recent fabrication.' " Chandler v. State, 702 So. 2d 186, 197-98 (Fla. 1997) (quoting § 90.801(2)(b), Fla. Stat. (1989)).

In this case, Ms. Price was subject to cross-examination, and the prior consistent statement was offered to rebut an implied charge of improper influence, motive, or fabrication. By eliciting testimony of a financial benefit, the defense implied an improper motive for Ms. Price's testimony. Ms. Price's prior consistent statement, which she made the day after the murders when she went to the police, was offered to rebut this implied charge of improper motive. Accordingly, the trial court did not abuse its discretion in admitting Ms. Price's prior consistent statement.

**E. Threats to Ashley Price**

Morris also contends that the trial court erred in denying Morris' motion for mistrial based on the jury hearing about threats against Ashley Price. The trial court denied the motion because the threats could not be attributed to Morris and because the trial court also provided a curative instruction. We conclude that the trial court did not abuse its discretion.

This Court reviews a trial court's ruling on a motion for mistrial for abuse of discretion. Salazar v. State, 991 So. 2d 364, 371 (Fla. 2008). "A motion for mistrial should be granted only when it is necessary to ensure that the defendant receives a fair trial." Id. at 372 (quoting Cole v. State, 701 So. 2d 845, 853 (Fla. 1997)). In other words, "[a] motion for a mistrial should only be granted when an error is so prejudicial as to vitiate the entire trial." England v. State, 940 So. 2d 389, 401-02 (Fla. 2006). Additionally, "[i]t has been held that evidence of threats made against witnesses is inadmissible to prove guilt unless the threats are shown to be attributable to the defendant." Koon v. State, 513 So. 2d 1253, 1256 (Fla. 1987).

In this case, the State did not suggest, with its question regarding threats, that the threat came from the defendant. Additionally, the suggested threats in this case were not made to influence Ms. Price's testimony, but rather the threats of an unknown and ambiguous nature were apparently the reason for Ms. Price relocating her residence. Cf. Jones v. State, 385 So. 2d 1042, 1043-44 (Fla. 1st DCA 1980) (reversing and remanding for a new trial when the State insinuated that the defendant, or someone connected with him, had made threats against a witness to keep her from testifying without presenting any evidence to connect the defendant to the threats), disapproved on other grounds by Justus v. State, 438 So. 2d 358, 368 (Fla. 1983). Furthermore, even assuming the question from the State

- 19 -

was inappropriate, there was no response to the question because the defense promptly objected, the State stopped its questioning of the witness after the court sustained the defense's objection, and the court gave a curative instruction explaining that Morris had nothing to do with the threats mentioned. See Tumblin, 29 So. 3d at 1102 ("The giving of a curative instruction will often obviate the necessity of a mistrial." (quoting Graham v. State, 479 So. 2d 824, 825 (Fla. 2d DCA 1985))). Accordingly, the trial court did not abuse its discretion in denying the motion for mistrial.[4]

## F. Sufficiency

Regardless of whether the parties raise the issue, this Court "independently review[s] the sufficiency of the evidence in every case in which a sentence of death has been imposed." Miller v. State, 42 So. 3d 204, 227 (Fla. 2010). To conduct this review, this Court "view[s] the evidence in the light most favorable to the State to determine whether a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt." Rodgers v. State, 948 So. 2d 655, 674 (Fla. 2006); see also Davis v. State, 2 So. 3d 952, 966-67 (Fla. 2008) ("In appeals where the death penalty has been imposed, this Court independently

---

4. We also conclude that Morris was not denied a fundamentally fair trial based on cumulative error. See Brooks v. State, 918 So. 2d 181, 202 (Fla. 2005), receded from on other grounds by State v. Sturdivant, 94 So. 3d 434, 437 (Fla. 2012); Jackson v. State, 575 So. 2d 181, 189 (Fla. 1991).

reviews the record to confirm that the jury's verdict is supported by competent, substantial evidence.").

As detailed above, the dashcam video from Officer Curtis' patrol car captured the killings of Officers Curtis and Kocab. In the video, Morris identifies himself, spelling his full name and accurately providing his date of birth and age. This same identifying information was discovered in Officer Curtis' car, including on Officer Curtis' notepad on which he wrote the identifying information the passenger provided him and on Officer Curtis' in-car computer after he entered a search with Morris' identifying information. Additionally, Ashley Price testified that Morris called her the morning of the shootings, and Morris confided in her, telling her "that he did it" and giving her details about the crime not yet released to the media. And Temika Jones testified at trial and identified Morris from a still picture taken from the dashcam video. Two witnesses testified that they saw a black male running from the scene of the crime after the shootings and saw him jump a large fence at the back of an apartment complex. One of these witnesses identified Morris from a photographic lineup shown to her by detectives the day after the shootings.

Accordingly, competent, substantial evidence supports Morris' convictions for first-degree murder.

## G.  Proportionality

Furthermore, Morris' death sentences are proportionate under the comparative proportionality review this Court undertakes in every death penalty case.  In conducting its proportionality review, this Court does not compare the number of aggravating and mitigating circumstances.  Pham v. State, 70 So. 3d 485, 500 (Fla. 2011).  Instead, this "Court looks at the totality of the circumstances to determine if death is warranted in comparison to other cases where the sentence of death has been upheld."  Id. (quoting England, 940 So. 2d at 408).  Additionally, this Court has recognized that, "[q]ualitatively, prior violent felony and HAC are among the weightiest aggravators set out in the statutory sentencing scheme." Hodges v. State, 55 So. 3d 515, 542 (Fla. 2010).

Morris' case involves the shooting of two law enforcement officers on duty. His jury recommended death by a vote of twelve to zero on both counts of first-degree murder.  The trial court found three aggravating circumstances were proved as to each count beyond a reasonable doubt and assigned weight as follows:  (1) prior capital felony conviction (great weight); (2) escape or avoid arrest (did not weigh or consider because merged with law enforcement officer aggravator); and (3) victim was a law enforcement officer (great weight).  In contrast to this weighty aggravation, the trial court found 22 nonstatutory mitigating circumstances, none of which were assigned more than moderate weight.

Under the totality of the circumstances, Morris' death sentences are proportionate in relation to other death sentences that this Court has upheld. See Burns v. State, 699 So. 2d 646, 651 (Fla. 1997) (finding death sentence proportionate where the trial court found and merged three aggravators, and found two statutory mitigators, including the defendant's age (42 years old) at the time of the offense and no significant criminal history, and a number of nonstatutory mitigators); see also Altersberger v. State, 103 So. 3d 122, 130-31 (Fla. 2012) (finding death sentence proportionate where the trial court found the aggravators (1) CCP (great weight); and (2) victim was a law enforcement officer (great weight), and several mitigating circumstances, including that capacity to appreciate the criminality of conduct or to conform conduct to the requirements of law was substantially impaired (moderate weight), and defendant was brought up in a dysfunctional family and home environment (moderate weight)); Wheeler v. State, 4 So. 3d 599, 613 (Fla. 2009) (finding death sentence proportionate where the trial court found the aggravators (1) CCP (great weight); (2) the merged avoid arrest aggravator, that the victim was a law enforcement officer and murder was committed to disrupt or hinder the enforcement of law; and (3) prior violent felony (some weight), and mitigating circumstances (1) committed while under the influence of extreme mental and emotional disturbance (some weight); (2) capacity to appreciate the criminality of conduct or to conform conduct to the requirements

of law was substantially impaired (some weight); and other mitigators given minimal to some weight); Bailey v. State, 998 So. 2d 545, 551-52, 554 (Fla. 2008) (finding death sentence proportionate where the trial court found the aggravators (1) defendant was on probation at the time of the crime (great weight); and (2) avoid arrest (great weight), and a number of nonstatutory mitigating circumstances, such as the defendant's young age and low IQ, all given little weight).

Accordingly, we conclude that Morris' sentences are proportionate.

## H. Hurst

Finally, after the United States Supreme Court issued its decision in Hurst v. Florida, 136 S. Ct. 616 (2016), Morris filed supplemental briefing, arguing that his death sentences are unconstitutional under Hurst and that his case should be remanded for the imposition of life sentences. However, because the Hurst error in this case is harmless beyond a reasonable doubt, we affirm Morris' death sentences.

We have held that "section 775.082(2), Florida Statutes, does not mandate the imposition of a life sentence in the event of a [Hurst] violation." Knight v. State, 42 Fla. L. Weekly S133, S140, 2017 WL 411329, at *14 (Fla. Jan. 31, 2017) (citing Hurst v. State, 202 So. 3d 40, 63-66 (Fla. 2016), petition for cert. filed, No. 16-998 (U.S. Feb. 13, 2017)). Moreover, in Davis v. State, 207 So. 3d 142 (Fla. 2016), petition for cert. filed, No. 16-8569 (Mar. 30, 2017), this Court emphasized

the unanimous recommendations of death and held that the <u>Hurst</u> error was harmless.

> What we said in <u>Davis</u>, 207 So. 3d at 175, is also applicable here:
>
> [T]he jury unanimously found all of the necessary facts for the imposition of death sentences by virtue of its unanimous recommendations. In fact, although the jury was informed that it was not required to recommend death unanimously, and despite the mitigation presented, the jury still unanimously recommended that [the defendant] be sentenced to death . . . . The unanimous recommendations here are precisely what we determined in <u>Hurst</u> to be constitutionally necessary to impose a sentence of death.

Accordingly, the <u>Hurst</u> violation in Morris' case was harmless beyond a reasonable doubt. <u>See id.</u> Therefore, as in <u>Davis</u>, the <u>Hurst</u> violation here does not entitle Morris to a new penalty phase.

### III. Conclusion

For the foregoing reasons, we affirm Morris' convictions for first-degree murder and his sentences of death.

It is so ordered.

LABARGA, C.J., and PARIENTE, and LEWIS, JJ., concur.
CANADY, POLSTON, and LAWSON, JJ., concur as to the conviction and concur in result as to the sentence.
QUINCE, J., concurs in part and dissents in part with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

QUINCE, J., concurring in part and dissenting in part.

I agree with the majority's decision to affirm Morris's convictions of two counts of first-degree murder. I dissent, however, to the decision to affirm Morris's sentences and would find that the Hurst error in this case was not harmless beyond a reasonable doubt. As I've stated previously, "[b]ecause Hurst 'requires a jury, not a judge, to find each fact necessary to impose a sentence of death,' the error cannot be harmless where such a factual determination was not made." Hall v. State, 42 Fla. L. Weekly S153, S165, 2017 WL 526509 at *24 (Fla. Feb. 9, 2017) (Quince, J., concurring in part and dissenting in part) (quoting Hurst v. Florida, 136 S. Ct. 616, 619 (2016)); see also Truehill v. State, 42 Fla. L. Weekly S223, S234, 2017 WL 727167 at *23 (Fla. Feb. 23, 2017).

An Appeal from the Circuit Court in and for Hillsborough County,
    William Fuente, Judge - Case No. 292010CF010203000AHC

Howard L. "Rex" Dimmig, II, Public Defender, and Cynthia J. Dodge, Assistant Public Defender, Tenth Judicial Circuit, Bartow, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and Carol M. Dittmar, Senior Assistant Attorney General, Tampa, Florida,

    for Appellee