# Supreme Court of Florida

————————

No. SC16-1711

————————

**JAMES GUZMAN,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[February 22, 2018]

PER CURIAM.

James Guzman appeals his convictions for armed robbery and first-degree murder and sentence of death.[1] For the following reasons, we affirm the convictions but vacate his death sentence and remand for a new penalty phase.

## I. BACKGROUND

In September 1992, James Guzman was convicted for the August 10, 1991, armed robbery and first-degree murder of David Colvin and was subsequently sentenced to death for the murder conviction. On direct appeal, we reversed

---

1. We have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const.

Guzman's convictions and remanded the case for a new trial, holding that Guzman's right to conflict-free counsel was violated because his public defender had a conflict of interest. *Guzman v. State*, 644 So. 2d 996, 999 (Fla. 1994).

At retrial, Guzman was again found guilty of first-degree murder and armed robbery and sentenced to death. *Guzman v. State*, 721 So. 2d 1155, 1156 (Fla. 1998). On direct appeal, we affirmed Guzman's convictions and death sentence. *Id.* at 1162. Post-conviction relief was denied, and we affirmed. *Guzman v. State*, 941 So. 2d 1045, 1052 (Fla. 2006).

Next, Guzman filed a petition for writ of habeas corpus with the U. S. District Court, Middle District of Florida, and the court ruled in Guzman's favor based on a *Giglio*[2] and *Brady*[3] violation. *Guzman v. Sec'y, Dep't of Corrs.*, 698 F. Supp. 2d 1317, 1329-35 (M.D. Fla. 2010). The U. S. Court of Appeals for the Eleventh Circuit affirmed and remanded Guzman's case for a new trial. *Guzman v. Sec'y, Dep't of Corrs.*, 663 F.3d 1336, 1339 (11th Cir. 2011). Guzman now appeals his convictions and sentence of death following his third trial on these charges.

---

2. *Giglio v. United States*, 405 U.S. 150 (1972).

3. *Brady v. Maryland*, 373 U.S. 83 (1963).

The evidence at Guzman's third trial established that on August 12, 1991, police were dispatched to a motel after a motel employee discovered David Colvin's body lying face down on a bed in his motel room, covered in blood. There was blood spatter across the bed, pillows, and walls, and a fragment of Colvin's skull was located by the foot of the bed. The police also found a twisted and bent samurai sword in the room. However, there was no blood or fingerprints found on the sword. Colvin's blood alcohol level was .34 at the time of his death.

The former testimony of Dr. Terrance Steiner, an interim medical examiner for Volusia County, was introduced into evidence because he was deceased at the time of the retrial. Dr. Steiner performed an autopsy, which revealed nineteen stab and incised wounds to Colvin's body. Colvin received eleven stab wounds to his face and scalp, four to his back, three to his chest, and one defensive wound to his left forefinger. One stab wound to Colvin's left chest was fatal because it cut his pulmonary artery and punctured his left lung, and Colvin would have lost consciousness anywhere from twenty seconds to two minutes after receiving this stab wound. The other stab wounds to his head also contributed to his death. Colvin's cause of death was blood loss and shock due to the multiple stab and incised wounds. Dr. Steiner determined that Colvin died on the evening of Saturday, August 10, 1991. Additionally, Dr. Steiner stated that the sword found at the scene was consistent with the wounds Colvin received.

Allison Sylvester, the lead homicide detective on the case, testified that she responded to the crime scene on the morning of August 12, 1991. During the initial investigation, Detective Sylvester interviewed Martha Cronin and James Guzman, who lived together in a room at the motel. Guzman and Cronin denied knowing anything about Colvin's murder. However, Officer Robert Walker testified that several months later, in November 1991, when he arrested Cronin for violating her probation, Cronin became upset and said she had knowledge about a man who was killed in a motel room with a sword. Cronin also stated that she knew the location of a ring that had been stolen from the victim.

At trial, Cronin testified that in August 1991 she met Guzman, and he moved into her motel room. They formed a business relationship where he protected her while she engaged in prostitution, and in return, Cronin paid for Guzman's room, food, and drugs. This eventually turned into a romantic relationship. At some point after Guzman moved in, Guzman, while fiddling with his survival knife, told her that it would be easy to rob Colvin because he was old, drunk, and known to carry money. At the same time, Guzman also said, "A dead witness can't talk."

On the morning of Saturday, August 10, 1991, Guzman told Cronin that he was taking Colvin to run some errands. Upon return, Guzman showed her that he had Colvin's keys. Cronin then left the motel room to engage in prostitution. When she returned around 2:30 or 3 p.m., Guzman was not in the room. A short

time later, Guzman returned to the room, carrying a garbage bag with rags or towels in it and went straight to the bathroom.  Then, Guzman left the room with the bag and returned a minute later without it.  Guzman sat down and told Cronin, "I did it."  She asked him what he did, and he clarified, "I killed David."  He said he stabbed Colvin with a samurai sword and showed Cronin a ring and money.  Cronin examined the ring and saw that it appeared to have blood on it.  She testified that it was the same ring that Colvin wore.  Cronin told Guzman to get rid of the ring, and he left the room, taking the ring with him.  Guzman returned later without the ring and said that he gave the ring to a drug dealer known as "Paco" in exchange for money and drugs.

Officer Walker testified that he found "Paco," whose real name is Leroy Gadson, Jr., and recovered the gold ring.  At trial, Gadson testified that in 1991 he was a drug dealer and occasionally sold Guzman drugs.  Moreover, in August 1991, Guzman went to him and asked to trade the gold ring for drugs.

The former testimony of Paul Rodgers, Guzman's former cellmate, was presented because he was deceased at the time of the retrial.  Rodgers testified that Guzman initially told him that he thought a man named Curtis Wallace killed Colvin.  Then, Guzman changed his story and said that he killed Colvin.  Guzman explained that he used Colvin's key to enter his motel room in order to rob him.  At first, Colvin was asleep and Guzman rummaged through Colvin's drawers.  But

Colvin woke up, and Guzman used a samurai sword that was hanging on the wall to kill Colvin while Colvin was sitting on the bed. Guzman was unsure about the exact number of times he stabbed Colvin, but estimated that it was ten or eleven times. Afterwards, Guzman cleaned the room, took Colvin's ring and $600, and went back to his motel room. Later, Guzman traded the ring for drugs.

Robert Harris, a gas station attendant, testified that on August 10, 1991, at about 10 a.m., Colvin came into the gas station with a man who was wearing a black vest and a black leather chauffeur's cap. Additionally, Margaret Post, a waitress, testified that on the morning of August 10, 1991, Colvin and Guzman came into the IHOP where she worked, and she waited on them. Guzman was wearing a black leather hat, black leather vest, and a pair of jeans. She noticed that Colvin was wearing his gold ring, and she described Colvin as very intoxicated.

Leroy Parker, a crime-lab analyst, responded to the motel to perform bloodstain-pattern analysis. Parker testified that based on his observation and analysis, Colvin was on the bed at the time of his murder. Parker explained that the bloodstains high on the wall were created from a forceful impact with the victim. He determined that the sword found at the scene was consistent with the blood spatter evidence. Also, Kelly May, a senior crime-laboratory analyst, testified that Guzman's fingerprints were on Colvin's vehicle and the telephone inside Colvin's room.

In Guzman's case-in-chief, he presented testimony from Carmelo Garcia, a former inmate who was incarcerated with Guzman. At some point during their incarceration, Garcia told Guzman that a prostitute confided in him that she lied to the police, which led to a man named "Chico," Guzman's nickname, being falsely imprisoned. Later, Garcia found out that this prostitute was Martha Cronin.

Guzman also testified in his own defense. He stated that on the morning of August 10, 1991, he drove Colvin around town, making stops at a gas station, a local bar, and an IHOP. While they were at IHOP, Curtis Wallace stopped by their table and asked Colvin about money Colvin owed him. Colvin stated he would pay Wallace after they got back to the motel. Colvin and Guzman returned to the motel sometime before noon, and they each went to their own room. Guzman claims that was the last time he saw Colvin.

Next, Guzman went out with Cronin on the street, where she engaged in prostitution. Cronin gave Guzman a signal to wait on the street for her, but after she did not return within 20 to 30 minutes, he decided to go back to the motel room. Cronin returned to the motel room around 1 or 2 p.m. with Wallace. Cronin was wearing a ring that she got from Wallace, and she asked Guzman to take the ring to Gadson to sell it for drugs. Guzman traded the ring for drugs and money and returned to the motel room, giving Cronin the drugs but keeping the money for himself.

In rebuttal, the State presented Cronin and Detective Sylvester. Cronin testified that she did not recognize a picture of Garcia taken some time between 1991 and 1992, and she denied telling anyone during that timeframe that she spoke to the police about Colvin's murder. Additionally, Cronin stated that Wallace had nothing to do with Colvin's ring. Detective Sylvester testified that after the ring was recovered from Gadson, she questioned Guzman about it, and he claimed he did not recognize the ring.

The jury found Guzman guilty of both first-degree premeditated murder and first-degree felony murder. The jury also found Guzman guilty of robbery with a deadly weapon.

Guzman's penalty phase was held on May 3, 2016. The State presented evidence that Guzman previously pleaded guilty to the second-degree murder of Brenda Fowler, the attempted second-degree murder of Elinda Williams, two counts of armed kidnapping, and two counts of armed robbery. At the time of the crimes, Guzman was seventeen years old. Guzman was sentenced to 30 years' imprisonment but was released on April 19, 1991, after only serving a little over nine years. Additionally, the State presented victim impact testimony from Colvin's widow. In mitigation, the defense introduced into evidence Guzman's high school diploma and a composite of certificates Guzman received. The jury

unanimously found all four aggravating factors the State presented and recommended death by a vote of eleven to one.

On August 30, 2016, the trial court sentenced Guzman to death in accordance with the jury's recommendation. The court found four aggravating factors beyond a reasonable doubt: (1) committed by a person previously convicted of another capital felony or a felony involving the use or threat of violence to the person (very great weight); (2) committed while the defendant was engaged in the commission of a robbery (substantial weight); (3) committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody (substantial weight); and (4) especially heinous, atrocious, or cruel (HAC) (very great weight). The trial court found that Guzman's age at the time of the crime, twenty-seven, was a single statutory mitigating circumstance. Additionally, the trial court found three nonstatutory mitigating circumstances: (1) Guzman was fifty-two at the time of sentencing (some weight); (2) Guzman was a drug user at some point in his life (little weight); and (3) Guzman had good conduct while incarcerated (little weight).

## II. ANALYSIS

On appeal, Guzman raises multiple issues. We also independently review whether there is sufficient evidence to support Guzman's conviction. However, because we remand for a new penalty phase based on *Hurst* error, we do not

discuss his other penalty phase claims or the proportionality of his sentence.[4]

## A. Denial of Cause Challenges to Prospective Jurors

Guzman first asserts that the trial court erred in denying cause challenges to prospective jurors Mr. Monagas, Ms. Routte, and Ms. Woods. Guzman used peremptory challenges to strike Mr. Monagas and Ms. Woods, but Ms. Routte sat on the jury. Guzman asserts that Mr. Monagas and Ms. Routte should have been excused because they were too distracted to sit on the jury and Ms. Woods should have been dismissed because of her views on the death penalty. The State counters that the trial court properly denied Guzman's cause challenges.

"The test for determining juror competency is whether the juror can lay aside any bias or prejudice and render his verdict solely upon the evidence presented and the instructions on the law given to him by the court." *Lusk v. State*, 446 So. 2d 1038, 1041 (Fla. 1984). "[B]ecause trial courts have a unique vantage point in their observation of jurors' voir dire responses," they have "great

---

4. Additionally, we hold that the trial court did not err in denying Guzman's motion to continue and his motion to disqualify the Office of the State Attorney for the Seventh Judicial Circuit. *See Pardo v. State*, 596 So. 2d 665, 666 (Fla. 1992) ("The decisions of the district courts of appeal represent the law of Florida unless and until they are overruled by this Court." (quoting *Stanfill v. State*, 384 So. 2d 141, 143 (Fla. 1980))); *Farina v. State*, 680 So. 2d 392, 395 (Fla. 1996) ("[D]isqualification is proper only if specific prejudice can be demonstrated.").

discretion when deciding whether to grant or deny a challenge for cause based on juror competency." *Conde v. State*, 860 So. 2d 930, 939 (Fla. 2003).

First, defense counsel properly preserved this issue for review because Guzman exhausted all of his peremptory challenges and identified Ms. Routte as an objectionable juror who sat on the jury. *See Kopsho v. State*, 959 So. 2d 168, 173 (Fla. 2007) (quoting *Busby v. State*, 894 So. 2d 88, 96-97 (Fla. 2004)). Second, we note that "[a] defendant cannot demonstrate prejudice if the trial court grants the same number of additional peremptories as cause challenges that were erroneously denied." *Id.* (quoting *Busby*, 894 So. 2d at 97).

The first challenged venireman we address is Mr. Monagas. During voir dire, when counsel asked him if serving on the jury would cause a financial burden that would distract him during the trial, he replied that he would get some money from his job and could live on that but he believed he would not do a good job on the jury because he is easily bored and might fall asleep during the trial. Based on his response, defense counsel challenged Mr. Monagas for cause. However, the record reflects that both defense counsel and the trial court acknowledged that Mr. Monagas was "probably the liveliest of the jurors," and that he was playful and laughing during the voir dire process. Therefore, because the trial court was in a better position to assess the ability of Mr. Monagas to serve on the jury and there was nothing in his responses to indicate that he was unable to render a verdict

- 11 -

solely upon the evidence presented and the instructions on the law given to him by the court, we conclude that the trial court did not abuse its discretion in denying Guzman's cause challenge of Mr. Monagas. *See Parker v. State*, 641 So. 2d 369, 373 (Fla. 1994) (concluding the trial judge did not abuse his discretion in denying the cause challenges).

The second challenged prospective juror, Ms. Routte, was asked several times whether she would be distracted from the trial by her work commitments. Ms. Routte responded, "I think I would be tired," and explained that she had a new person working for her that she believed could manage the business without her. Ms. Routte did not state that she would be unable to focus on the trial. Thus, the trial court did not abuse its discretion in denying Guzman's challenge to Ms. Routte because there was nothing in her responses to indicate that she was unable to render a verdict solely upon the evidence presented and the instructions on the law given. *See id.* Further, Guzman's argument that the trial court's denial of the cause challenge to Ms. Routte was inconsistent with the court's rulings on other cause challenges is without merit.

Last, since we determined that the trial court did not err in denying the cause challenges to Mr. Monagas or Ms. Routte, we do not have to consider whether the trial court erred in denying the cause challenge to Ms. Woods because the court provided Guzman an additional peremptory challenge. Thus, even if the trial court

erred in denying the challenge to Ms. Woods, it would not constitute reversible

error.  *See Kopsho*, 959 So. 2d at 173; *Overton v. State*, 801 So. 2d 877, 889 (Fla.

2001) ("[Defendant] must establish that the trial court erred in denying the

challenges for cause as to both [potential jurors] because the trial court did award

the defense one additional peremptory challenge . . . .").  Thus, we reject this

claim.

## B.  Challenge to State's Peremptory Strike of Minority Juror

Guzman also contends that the trial court reversibly erred when it allowed

the State to strike an African-American venirewoman without providing a genuine

race-neutral reason.  We disagree.

In *Melbourne v. State*, 679 So. 2d 759, 764 (Fla. 1996) (footnotes omitted),

we established a three-step guideline for resolving an allegation of discrimination

in the use of peremptory challenges:

> A party objecting to the other side's use of a peremptory
> challenge on racial grounds must:  a) make a timely objection on that
> basis, b) show that the venireperson is a member of a distinct racial
> group, and c) request that the court ask the striking party its reason for
> the strike.  If these initial requirements are met (step 1), the court must
> ask the proponent of the strike to explain the reason for the strike.
>        At this point, the burden of production shifts to the proponent
> of the strike to come forward with a race-neutral explanation (step 2).
> If the explanation is facially race-neutral and the court believes that,
> given all the circumstances surrounding the strike, the explanation is
> not a pretext, the strike will be sustained (step 3).

Importantly, "[t]here are no specific words which the court must state to satisfy step three of the *Melbourne* analysis." *Murray v. State*, 3 So. 3d 1108, 1119 (Fla. 2009) (quoting *Simmons v. State*, 940 So. 2d 580, 582 (Fla. 1st DCA 2006)). "Rather, the most important consideration is that the trial judge actually 'believes that given all the circumstances surrounding the strike, the explanation is not a pretext.' " *Id.* at 1120 (quoting *Rodriguez v. State*, 753 So. 2d 29, 40 (Fla. 2000)). Further, reviewing courts should keep in mind that "peremptories are presumed to be exercised in a nondiscriminatory manner," and "the trial court's decision turns primarily on an assessment of credibility and will be affirmed on appeal unless clearly erroneous." *Melbourne*, 679 So. 2d at 764-65.

In this case, during voir dire, defense counsel asked the potential jurors which television stations they watched. Ms. Fields, an African-American, indicated that she watched CNN, whereas, Ms. Bentley, a Caucasian, indicated that she watched Fox News. Subsequently, the State exercised a peremptory challenge against Ms. Fields. Defense counsel asked for a race-neutral reason, and the State explained that they wished to strike CNN viewers and preferred jurors who watched Fox News. Then, defense counsel challenged the genuineness of the State's reason, asserting that Ms. Bentley also watched CNN. A discussion ensued wherein the State explained that they listed Ms. Bentley as a Fox News viewer in their notes, and the trial judge stated that Ms. Fields was the only CNN viewer

according to his notes.  In response, defense counsel stated,  "That's fine, your Honor."  The trial judge then found the State's reason to be race-neutral and overruled the defense's objection.

The trial court satisfied the *Melbourne* guidelines.  First, the trial court made a sufficient step-one inquiry in asking the State for a race-neutral reason for striking Ms. Fields.  Thereafter, the State satisfied step two by providing a facially race-neutral reason for the strike by explaining that it wanted to strike jurors who watched CNN as opposed to Fox News.  When Guzman questioned the genuineness of the State's explanation, the record clearly shows that the trial judge considered the genuineness of the State's reason by referencing his own notes and stating that the only juror he had down as a CNN viewer was Ms. Fields.  Thereafter, the trial court sustained the objection under step three as allowed when no pretext is found.  *See Murray*, 3 So. 3d at 1120-21; *Truehill v. State*, 211 So. 3d 930, 943 (Fla. 2017) ("Nothing in the record suggests that the State's strike was based on a reason equally applicable to an unchallenged juror or that she was singled out for special treatment.").  Thus, the trial court did not err in overruling Guzman's objection to the State's use of a peremptory challenge on Ms. Fields.

**C.  Motion to Strike Jury Panel**

Guzman further claims that the trial court abused its discretion in denying his motion to strike the jury panel based on statements made by a prospective juror, Mr. Monagas, during voir dire. However, we disagree.[5]

Mr. Monagas commented that Guzman "already served 25 years" in response to information presented to the entire jury panel that the trial was for a murder committed in 1991, and it appears that this statement was based on his hypothesis that Guzman had been in jail since the time of the murder. In essence, Mr. Monagas' statements in the presence of the jury amounted to a hypothetical question and did not disclose evidence or facts not presented at trial. As such, the statement was not tantamount to telling the venire that Guzman had a prior conviction. *See Morris v. State*, 219 So. 3d 33, 41 (Fla. 2017) (holding that the

---

5. As we explained in *Morris v. State*, 219 So. 3d 33, 41 (Fla. 2017):

> The denial of a motion to strike the jury panel is reviewed for abuse of discretion. *Williams v. Osking*, 105 So. 3d 653, 655 (Fla. 4th DCA 2013). "In order for the statement of one venire member to taint the panel, the venire member must mention facts that would not otherwise be presented to the jury." *Johnson v. State*, 903 So. 2d 888, 897 (Fla. 2005). Additionally, "[a] venire member's expression of an opinion before the entire panel is not normally considered sufficient to taint the remainder of the panel." *Id.*

A review of the record demonstrates that the trial court did not abuse its discretion in denying Guzman's motion to strike the entire jury panel because Mr. Monagas did not reveal any information about Guzman's prior criminal history. In fact, there is no indication that Mr. Monagas knew anything about Guzman's prior criminal history.

- 16 -

trial court did not abuse its discretion in denying defendant's motion to strike the jury panel where prospective juror's remarks did not reveal her knowledge of the defendant's previous crimes), *cert. denied*, 138 S. Ct. 452 (2017); *cf. Evans v. State*, 36 So. 3d 185, 185-86 (Fla. 4th DCA 2010) (reversing for a new trial because a venireperson's comments during voir dire that he knew the defendant from his work at the jail implied that the defendant had been previously convicted of a crime). Accordingly, the trial court did not abuse its discretion in denying Guzman's motion to strike the jury panel.

## D. Sufficiency

Although Guzman did not raise this issue, we have "a mandatory obligation to independently review the sufficiency of the evidence in every case in which a sentence of death has been imposed." *Miller v. State*, 42 So. 3d 204, 227 (Fla. 2010). We review the evidence in the light most favorable to the State to determine whether "a rational trier of fact could have concluded that the elements of the crime have been proven beyond a reasonable doubt." *Jeffries v. State*, 222 So. 3d 538, 546 (Fla. 2017).

Applying this standard, we conclude that competent, substantial evidence supports Guzman's conviction based on both theories of first-degree premeditated murder and felony murder. First, testimony from several witnesses, including

Guzman, Martha Cronin, the gas station attendant, and the waitress, established that Guzman was with Colvin in the morning on the day of Colvin's murder.

Moreover, Cronin testified that days before Colvin's murder, Guzman told her that Colvin would be easy to rob because he was old, drunk, and known to carry money. Guzman also said that "a dead witness can't talk." On the day of Colvin's murder, Guzman left in the morning to take Colvin to run errands and returned later with Colvin's keys. Cronin left the motel room, and when she returned in the afternoon, Guzman was not in the room. Soon after, Guzman returned to the room with a garbage bag but then left with the bag and quickly returned without it. At that point, Guzman confessed to Cronin that he killed Colvin by stabbing him with a samurai sword, showing Cronin some money and Guzman's ring. Guzman then left the room to sell the ring for money and drugs.

Furthermore, Rogers, Guzman's former cellmate, testified that Guzman admitted that he killed Colvin with a samurai sword and stole $600 and a ring, which he traded for drugs. Additionally, detectives recovered the ring from Gadson, a drug dealer. Moreover, Gadson testified that he sold drugs to Guzman in exchange for the ring.

Also, both Parker, a crime-lab analyst who testified regarding the bloodstain pattern, and Dr. Steiner, who performed the autopsy, testified that the samurai sword found at the scene could have been the murder weapon. Accordingly,

competent, substantial evidence exists to support Guzman's first-degree murder conviction under theories of first-degree premeditated murder and felony murder.

## E. *Hurst*

Finally, Guzman argues that *Hurst* error is not harmless and that he is entitled to either a life sentence with parole after twenty-five years or a new penalty phase. We agree that Guzman is entitled to relief under *Hurst* and remand this case for a new penalty phase.

Before Guzman's third trial, the United States Supreme Court issued its decision in *Hurst v. Florida*, 136 S. Ct. 616, 619 (2016), in which it held that Florida's former capital sentencing scheme violated the Sixth Amendment because it "required the judge to hold a separate hearing and determine whether sufficient aggravating circumstances existed to justify imposing the death penalty," even though "[t]he Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death." On remand in *Hurst v. State*, 202 So. 3d 40, 57 (Fla. 2016), *cert. denied*, 137 S. Ct. 2161 (2017), after Guzman's penalty phase, we held:

> [B]efore the trial judge may consider imposing a sentence of death, the jury in a capital case must unanimously and expressly find all the aggravating factors that were proven beyond a reasonable doubt, unanimously find that the aggravating factors are sufficient to impose death, unanimously find that the aggravating factors outweigh the mitigating circumstances, and unanimously recommend a sentence of death.

We also concluded that *Hurst* "error is capable of harmless error review," explaining:

> The harmless error test, as set forth in *Chapman[v. California*, 386 U.S. 18 (1967),] and progeny, places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction.

202 So. 3d at 68 (quoting *State v. DiGuilio*, 491 So. 2d 1129, 1138 (Fla. 1986)).

Although the jury unanimously found the aggravating factors, "based on the jury's eleven-to-one recommendation for a sentence of death, we cannot determine that the jury unanimously found that the aggravating factors were sufficient to impose a sentence of death." *Bailey v. Jones*, 225 So. 3d 776, 777 (Fla. 2017) (holding that a nonunanimous jury recommendation for death is not harmless even when "no reasonable juror would have failed to find" the existence of the aggravating factors). Nor can we "determine that the jury unanimously found that the aggravators outweighed the mitigation." *Kopsho v. State*, 209 So. 3d 568, 570 (Fla. 2017). "We can only determine that the jury did not unanimously recommend a sentence of death." *Id.* Therefore, because we cannot say that there is no possibility that the error did not contribute to the sentence, the error in Guzman's sentencing was not harmless beyond a reasonable doubt. Accordingly, we vacate the death sentence and remand for a new penalty phase. *See Jackson v.*

*State*, 213 So. 3d 754, 792 (Fla. 2017) ("[T]he proper remedy is to remand for a new penalty phase, rather than remand for the imposition of a life sentence.").

## III. CONCLUSION

For the foregoing reasons, we affirm Guzman's convictions, vacate his sentence of death, and remand for a new penalty phase.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, and QUINCE, JJ., concur.
LAWSON, J., concurs specially with an opinion.
CANADY and POLSTON, JJ., concur as to the conviction and dissent as to the sentence.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LAWSON, J., concurring specially.

I fully concur in that portion of the opinion affirming Guzman's convictions and concur specially in the reversal of Guzman's death sentence. *See Okafor v. State*, 225 So. 3d 768, 775-76 (Fla. 2017) (Lawson, J., concurring specially).

An Appeal from the Circuit Court in and for Volusia County,
    Terence R. Perkins, Judge - Case No. 641991CF006795XXXAES

Jeffrey D. Deen, Regional Counsel, Junior Barrett and Michael P. Reiter, Assistant Regional Counsel, Office of Criminal Conflict and Civil Regional Counsel, Fifth District, Ocala, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Doris Meacham, Assistant Attorney General, Daytona Beach, Florida,

for Appellee