# Supreme Court of Florida

---

No. SC20-155

---

**DONTAE R. MORRIS,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

April 8, 2021

PER CURIAM.

Dontae Morris appeals the denial of his initial postconviction motion filed under Florida Rule of Criminal Procedure 3.851.[1] For the reasons explained below, we affirm the postconviction court's denial of Morris' claims.

## I. BACKGROUND

Morris was convicted of two counts of first-degree premeditated murder for the murders of Officer David Curtis and

---

1. We have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const.

Officer Jeffrey Kocab and one count of escape while being

transported. *Morris v. State*, 219 So. 3d 33, 36 (Fla. 2017). On

direct appeal, this Court described the facts as follows:

> Morris was convicted and sentenced to death on two counts for the first-degree premeditated murders of Officer David Curtis and Officer Jeffrey Kocab. The evidence at trial established that on June 29, 2010, at about 2:13 a.m., Officer Curtis pulled over a red Toyota Camry in Hillsborough County for not displaying an automobile tag. Cortnee Brantley was the driver, and Dontae Morris was in the passenger's seat. The dashcam video from Officer Curtis' patrol car was played for the jury at trial. The transcript of that video includes a discussion in which Morris identifies himself to Officer Curtis, disclosing his name, age, and birthdate. The transcript continues with a discussion between Officer Curtis and Ms. Brantley about the missing tag on the vehicle, and Ms. Brantley states that the tag was stolen.
>
> Officer Curtis returned to his patrol car, entered Morris' name in his in-car computer, and discovered that there was a warrant out for Morris. He called for backup, and Officer Kocab pulled up and parked behind Officer Curtis' parked patrol car. Then both officers approached the passenger side of the parked Camry. Officer Curtis, with Officer Kocab standing right behind him at the passenger side of the vehicle, asked Morris to exit the vehicle. Morris exited the vehicle as if he was surrendering but instead grabbed a gun and shot both officers in the head. The approximate time for the homicides of Officers Curtis and Kocab was 2:18 a.m. This interaction is captured in the dashcam video in the following way:
>
> > [Officer Curtis]: —you know anything about it?
> >
> > [The Defendant]: The warrant?

[Officer Curtis]: Yeah.

[The Defendant]: I ain't got no warrant.

[Officer Curtis]: Okay.  Step over here.  Turn around and step and put your hands behind your back.

(Shots fired.)

[Brantley]: Baby—Babe.

The remaining portion of the video captures panicking individuals tending to the injured officers and performing CPR.  Both officers were transported to Tampa General Hospital where they were later pronounced dead.  The officers' autopsies confirmed that both officers died of fatal gunshot wounds to the head.  Furthermore, an expert in the field of firearms analysis and identification concluded that both of the projectiles removed from the bodies of Officer Curtis and Officer Kocab were fired from the same firearm.

Immediately following the shooting, Morris fled the scene, running on foot northbound.  Four days after the homicides, Morris turned himself in.

On the front seat of Officer Curtis' patrol vehicle, detectives found Officer Curtis' notepad and Cortnee Brantley's driver's license.  On the notepad, Officer Curtis had noted the name and birthdate of the passenger as it was provided to him when he asked the passenger to identify himself.  Additionally, in Officer Curtis' car, the mobile dispatch terminal, or in-car computer, indicated Dontae Morris' name, his identifying information, and a photograph of him.  Morris' birth certificate was entered into evidence and matched the name and birthdate that the passenger of the Camry in the dashcam video provided to Officer Curtis.

Temika Jones testified that she saw Morris, whom she knew as "Quelo," on the day of the murders in the morning.  She remembered that he was wearing a dark blue vest with a white shirt underneath, dark khaki

shorts, and white sneakers or tennis shoes. Ms. Jones also testified that Morris called her around 2 a.m. Later that day, detectives interviewed Ms. Jones. When the detectives showed her a photograph, which was a still photo from the dashcam video, she identified the individual in the photo as Morris. She testified that it looked like Morris because of the head shape and outfit and because he had on the same clothing that he had on that morning when she saw him.

Additionally, two witnesses testified that they saw a black male running northbound from the scene of the incident. Ynalia Keen lived in a bottom floor apartment near where the traffic stop took place. She testified that on the night of the incident, she had stepped out of her apartment to get snacks from a gas station, and, when she heard the gunshots, she rushed back inside. From inside her apartment, looking through a front window that looks out onto the street, she saw a black male running on the sidewalk towards her apartment building, then into the apartment complex, cutting through the middle of the parking lot, and jumping a small fence. When she could not see him through the front window, Ms. Keen went to the kitchen to look through the window at the back of the apartment, where she saw him jump another, taller, chain-link fence.

The next day, on June 30th, Detective Charles Massucci interviewed Ms. Keen. Ms. Keen identified Morris' photograph from a photographic lineup. Ms. Keen also wrote the following statement: "Seen him on the back road with a group of people. He had ran by my house when the people was shot. Seen him at the Shell store."

The other witness, Alfred Thompson, was walking northbound on the street where the traffic stop took place. As he walked past the Camry, he noticed that the car had two occupants sitting in the front seat, a black female in the driver's side and a black male in the passenger's side. He also saw the officer in his vehicle at that time. After Mr. Thompson passed the cars, he heard

two gunshots coming from behind him from the direction of the police car and the other vehicle, and he hid behind another car; he did not see the individual who fired the shots. Thereafter, Mr. Thompson saw a black male run northbound (on the same sidewalk he was walking on), go through an apartment complex, and jump a chain-link fence.

Just north of the crime scene, detectives found footprints on the bottom part of the large fence at the perimeter at the back of the apartment complex and also found a piece of a zipper that was torn off from an article of clothing attached to the top of that fence.

On the night of the murders, Morris called Ashley Price and confided in her regarding the murders. Ms. Price went to the Tampa Police Department on June 30, the next day, and spoke with Officer Kevin Durkin. She testified that she knew Morris as "Quelo" and that Morris called her more than once in the early morning hours of June 29. When she answered a call from Morris around 3:30 a.m., he asked for a ride, but she did not give him one. She spoke with him on the phone again at around noon that day, and Morris told Ms. Price "that he did it," telling her to watch the news about the police officers. Ms. Price also testified that Morris told her the following: that he shot the officers to get away from them, that he was out of the car when he shot the officers, that there were two officers, that he shot them in the head, that he referred to them as "crackers," that he got the gun from under the seat, that he gave the officer his name, that the officer had gone back to run his name, that he was afraid that he had a warrant, that he was the passenger in the car, and that he was going to try to go to Jacksonville.

Detective Charles Massucci confirmed that between the time of the murders and the afternoon of June 30, there were no releases from the Tampa Police Department about the facts of the case to the press or to the media concerning this subject matter that Ms. Price discussed.

The red Toyota Camry was located at an apartment complex on the morning of June 29, the same day as the crime, roughly nine-and-a-half hours after the crime itself. This apartment complex was located about 2.8 miles from the crime scene. The building in which Ms. Brantley, the driver, was located was about 500 yards from where the Camry was parked. Pursuant to a search warrant, the red Camry was seized and searched. DNA analysis showed the blood found on the exterior passenger side rear door matched that of Officer Curtis. Ms. Brantley was escorted to Tampa Police Department headquarters and was interviewed. During the approximately six-and-a-half hour interview, detectives asked Ms. Brantley more than once to identify the front seat passenger in the Camry during the stop, but she never identified him.

Additionally, cell phone records were presented at trial for cell phones associated with Morris and Ms. Brantley. Based on testimony regarding the cell records, cell towers, mapping, and diagrams, the cell phone use placed Morris and Ms. Brantley at or near the scene of the crime at the time of the incident. And the testimony revealed phone calls made in the minutes before and after the murders of the two officers from the cell phone associated with Morris.

Following the State's case, the defense rested without presenting any evidence or witnesses. Thereafter, the jury returned guilty verdicts for two counts of first-degree premeditated murder and one count of escape while being transported.

At the penalty phase, the State presented evidence that, on March 13, 2013, Morris was convicted of the first-degree murder and attempted robbery with a firearm of Rodney Jones and that Morris had been sentenced to life in prison without the possibility of parole for that conviction. The State also presented four victim impact statements from family members of Officers Curtis and Kocab. In mitigation, Morris presented the testimony of his mother, two cousins, and his aunt. On November 19,

2013, the jury recommended the death penalty by a vote of twelve to zero on both counts.

At the subsequent *Spencer* [*v. State,* 615 So. 2d 688 (Fla. 1993)] hearing, the defense presented mental health mitigation with expert testimony from Dr. Valerie McClain, an expert in forensic psychology and neuropsychology. Dr. McClain reviewed Morris' prior mental health records from Dr. Lamar Ingulli, which included memory testing and IQ testing. Dr. McClain diagnosed Morris with major depression with psychotic features and borderline intellectual functioning but not intellectually disabled. She testified that Morris had deficiencies in verbal comprehension, such as word knowledge and processing speed.

Then the State presented rebuttal mental health expert testimony and additional victim impact testimony. Dr. Emily E. Lazarou, an expert in the area of forensic psychiatry, testified that she reviewed Dr. McClain's depositions, Dr. Ingulli's medical records, and Morris' school records, and opined that Morris was in the average range of intellectual functioning with an IQ of at least 100 to 110.

*Morris,* 219 So. 3d at 36-40 (footnote omitted).

After the presentation of mitigating and aggravating factors, the trial court sentenced Morris to death in accordance with the jury's unanimous recommendations on both counts.[2] On direct

2. The trial court found the following aggravators were proven beyond a reasonable doubt and accorded them respective weight:

(1) the defendant was previously convicted of another capital felony or of a felony involving the use or threat of use of violence to a person (great weight); (2) the capital felony was committed for the purpose of avoiding or

preventing a lawful arrest or effecting an escape from custody (did not weigh or consider because merged with law enforcement officer aggravator); and (3) the victim of the capital felony was a law enforcement officer engaged in the performance of his official duties (great weight).

*Morris*, 219 So. 3d at 39-40. The trial court also found the following mitigators:

(1) Morris was prematurely born to a sixteen-year-old, unwed mother (minimal weight); (2) Morris' father was murdered when he was two years old (no weight); (3) Morris was raised by his maternal grandmother during his early years, but her health was fragile and she could not and did not adequately care for him (minimal weight); (4) Morris' mother did not bond with her child because she suffered severe postpartum depression and was a child herself (moderate weight); (5) Morris started to bond with his step-grandfather, but he became a crack addict and left the family (minimal weight); (6) Morris was raised without a father or any other male role model (moderate weight); (7) Morris' mother subsequently gave birth to two more children, and she eventually married their father (minimal weight); (8) Morris' mother attempted to make a home with a supportive family (minimal weight); (9) Morris' mother grew tired of the limited success of her efforts to integrate Morris into her new family, and Morris felt more and more isolated, alone, rejected, and left out (minimal weight); (10) Morris had to watch his siblings receive support and affection of a father, support he never had (minimal weight); (11) 14-year-old Morris assumed the role of man of the house and source of support for his siblings when his mother left her husband, and Morris suffered with his mother through a long and bitter divorce (minimal weight); (12) after the divorce, the family moved in with another man, and he and Morris competed for the role of man of the house and father to his siblings, and Morris was asked to

- 8 -

leave the home (moderate weight); (13) the family conflict was encouraged by Morris' former stepfather, who undermined and sabotaged the discipline of Morris and his siblings (moderate weight); (14) Morris lived for a period of time with his paternal grandparents, but they failed to control or discipline him, and he showed signs of deteriorating school work and social and behavioral turmoil (minimal weight); (15) Morris was close to his aunt and his cousins, who were positive influences and a healthy support system for him, but they moved during the time of his family's turmoil (minimal weight); (16) Morris' early teen years were unstable, and he was uprooted multiple times, attending five different schools and living in various relatives' homes over a two-year period (minimal weight); (17) when Morris became involved in the juvenile justice system, his mother obtained counseling for him, and she also petitioned juvenile authorities and the court system to get more stringent treatment programs for him (moderate weight); (18) his mother's requests were refused, and she was told Morris' offenses were not serious enough, and he got no meaningful help or guidance during this critical juncture in his development (moderate weight); (19) Morris has maintained a supportive relationship with his child (moderate weight); (20) Morris has maintained a caring and supportive relationship with his cousins and other family members even while in jail (minimal weight); (21) Morris has expressed remorse for killing (minimal weight); and (22) the above circumstances cumulatively established general mitigating evidence that provides reasons the death penalty is not appropriate (moderate weight).

*Id.* at 40.

- 9 -

appeal, we affirmed Morris' convictions and sentences of death. *Id.* at 46. The United States Supreme Court denied certiorari on November 13, 2017. *Morris v. Florida*, 138 S. Ct. 452 (2017).

On November 6, 2018, Morris filed a postconviction motion pursuant to Florida Rule of Criminal Procedure 3.851. He raised 7 claims, and the circuit court granted an evidentiary hearing on most of Morris' claims on June 10, 2019, but reserved ruling on Morris' cumulative error claim and *Brady*[3] claim. During the evidentiary hearing, the postconviction court heard testimony from Morris' trial counsel, Karen Meeks and Christopher Boldt; mental health experts who had testified at trial as well as new mental health experts; Ashley Price and James Baird (Price's former partner); and Marcus Oglesby, a friend of Morris' who claimed to have seen him the night of the murders. On December 30, 2019, the postconviction court entered an order denying Morris' postconviction motion as to all claims. This appeal followed.

3. *Brady v. Maryland*, 373 U.S. 83 (1963).

## II. ANALYSIS

Morris now appeals the denial of relief, arguing that the postconviction court erred in denying his initial postconviction motion claims, including claims of (A) newly discovered evidence, (B) ineffective assistance of counsel during the guilt phase of the trial, (C) ineffective assistance of counsel during the penalty phase of the trial, (D) cumulative error, and (E) a *Brady* violation. We address each claim in turn.

### A. Newly Discovered Evidence

Morris first argues that the postconviction court erred in denying his claim of newly discovered evidence showing Ashley Price lied when testifying against Morris at trial. Specifically, Morris submits the testimony of James Baird, an inmate who was in a relationship with Price around the time of Morris' arrest and trial, that Price testified against Morris because she was pressured by the State and law enforcement and that Morris never confessed to her. We affirm the denial of this claim.

To successfully claim newly discovered evidence, a defendant must meet the two requirements set forth by this Court in *Jones v. State*, 709 So. 2d 512, 521-22 (Fla. 1998). "First, in order to be

considered newly discovered the evidence 'must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that defendant or his counsel could not have known [of it] by the use of diligence.' " *Id.* at 521 (alteration in original) (quoting *Torres-Arboleda v. Dugger*, 636 So. 2d 1321, 1324-25 (Fla. 1994)). "Second, the newly discovered evidence must be of such nature that it would probably produce acquittal on retrial." *Id.*

Under the second prong, the reviewing court[4] must "evaluate the 'weight of both the newly discovered evidence and the evidence which was introduced at trial.' " *Id.* (quoting *Jones v. State*, 591 So. 2d 911, 916 (Fla. 1991)). This determination includes

> whether the evidence goes to the merits of the case or whether it constitutes impeachment evidence. The trial court should also determine whether the evidence is cumulative to other evidence in the case. The trial court should further consider the materiality and relevance of the evidence and any inconsistencies in the newly discovered evidence.

---

4. This Court "review[s] the trial court's findings on questions of fact, the credibility of witnesses, and the weight of the evidence for competent, substantial evidence" and reviews the application of the law to the facts de novo. *Green v. State*, 975 So. 2d 1090, 1100 (Fla. 2008).

*Id.* (citations omitted).

Morris' claim fails the first prong of *Jones* because he has not demonstrated that the evidence was unavailable at trial and could not have been discovered with due diligence. *See Dailey v. State*, 279 So. 3d 1208, 1215 (Fla. 2019) (holding that evidence related to impeachment of a key witness could have been discovered by due diligence where the defendant proffered documents that were created around the time of trial and no other explanation for why they were not discovered was given). Morris does not allege that the defense team was unable to obtain Baird's testimony prior to trial and offers no explanation as to why Baird, who was in a relationship with Price at the time of trial and was the father of her unborn child, was not contacted by trial counsel. His only contention is that Baird "made it clear during his evidentiary hearing that he did not view it possible to reveal any of this information prior to these postconviction proceedings," but Baird only testified that he did not come forward with this information because he did not know Morris or his attorneys. This does not establish that Baird was unavailable or that trial counsel was unable to discover his evidence. *See Kormondy v. State*, 154 So. 3d

- 13 -

341, 350-53 (Fla. 2015) (rejecting a claim that trial counsel discovered new evidence of witnesses who purported to incriminate a suspect based on conversations they had prior to trial when the fact of communication between witnesses and the suspect was established on record prior to the postconviction proceedings). Moreover, this is not a situation where a witness later recants testimony, meaning that the recantation is newly available. *See Davis v. State*, 26 So. 3d 519, 528 (Fla. 2009) ("Regardless of the time span from the time of trial to the discovery of the new testimony, recanted testimony cannot be 'discovered' until the witness *chooses* to recant."). The first prong of *Jones* has not been met.

Additionally, even if the testimony of Baird did meet the first prong of *Jones*, it is not likely to produce an acquittal upon retrial and fails the second prong. As the State correctly notes, Baird's testimony regarding Price's alleged prior statements constitute hearsay and could only be admissible to impeach Price. *See* § 90.801, Fla. Stat. (2020) (defining hearsay); § 90.608, Fla. Stat. (2020) (providing for impeachment of a witness by introduction of prior inconsistent statements). To the extent Baird's testimony

casts doubt on Price's motives for testifying or presents evidence of State influence, the impeachment value of this testimony is overcome by the rehabilitation of Price at the evidentiary hearing, namely Price's testimony that the police did not pressure her and her insistence that she did not discuss her involvement in the case with Baird. *See Merck v. State*, 260 So. 3d 184, 198-99 (Fla. 2018) (holding that the evidentiary value of a testimony related to a key witness' bias or motive would be overcome by potential rehabilitation, so the proffered evidence probably would not produce acquittal upon retrial). Further, when considered cumulatively, Baird's testimony about Price's prior statements does not overcome the weight of evidence presented against Morris at trial. In addition to the testimony given by Price, the following evidence was presented at trial: (1) dashcam footage of the shooting; (2) Officer Curtis' notepad with Morris' name and identifying information found in the passenger seat of the patrol car; (3) testimony of Temika Jones identifying Morris in a photograph taken from the dashcam; (4) testimony of Ynalia Keen identifying Morris in a photographic lineup as the black man she saw running northbound from the scene of the incident; (5) testimony of Alfred Thompson

- 15 -

that he saw a black female and black male sitting in the Camry before he heard gunshots and saw a black male run northbound and jump a chain-link fence; (6) footprints and a portion of a torn zipper at a nearby chain-link fence; and (7) cell phone records placing Brantley and Morris at or near the scene of the crime at the time of the incident. *Morris*, 219 So. 3d at 37-39. And the postconviction court found Baird's testimony to not be credible in light of Price's testimony refuting Baird's claims. *See Hurst v. State*, 18 So. 3d 975, 993 (Fla. 2009) ("[W]e will not substitute our judgment for that of the trial court on questions of fact, credibility of witnesses, or the weight to be given to the evidence by the trial court."). Therefore, Morris has failed to establish that this testimony from Baird would probably produce acquittal on retrial, and we affirm the postconviction court's denial of this claim.

### B. Ineffective Assistance of Counsel During the Guilt Phase

Morris next argues that the postconviction court erred in denying his claim that trial counsel was ineffective during the guilt phase of the trial for (1) failing to conduct a reasonable investigation and present evidence that could have meaningfully challenged the State's case; (2) failing to prevent the jury from seeing inflammatory

- 16 -

evidence, specifically the dashcam footage of officers attempting to revive their colleagues; (3) failing to object to the use of racial slurs at trial; and (4) failing to obtain a working video of a November 10, 2011, jail visit. Because Morris has not established both deficiency and prejudice with regard to any of these claims, we affirm the denial of relief.

To succeed in a claim of ineffective assistance of counsel, the defendant must prove two things: "[f]irst, the defendant must show that counsel's performance was deficient," and "[s]econd, the defendant must show that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Regarding the performance prong, "[j]udicial scrutiny of counsel's performance must be highly deferential," and the appropriate standard is "reasonableness under prevailing professional norms." *Id.* at 688-89. "A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. Moreover, counsel's "strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was

reasonable under the norms of professional conduct." *Occhicone v. State*, 768 So. 2d 1037, 1048 (Fla. 2000). Further, to prevail under the prejudice prong, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Specifically, a "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

*1. Failure to Investigate and Present Evidence that Would Have Meaningfully Challenged the State's Case*

Morris argues that the postconviction court erred in denying his claim that trial counsel was ineffective for failing to challenge the State's case in the following ways: (1) failing to present evidence of checks cashed in 2008 by someone impersonating Dontae Morris, (2) failing to challenge Price's testimony by presenting evidence of her continuing child custody issues, relationship with the Tampa Police Department (TPD), financial struggles, and violation of probation charges; (3) failing to call Marcus Oglesby as a witness to contradict the identification of Morris based on his clothes the day of the shooting; and (4) failure to present text messages that showed Cortnee Brantley and Morris had broken up

- 18 -

the day of the shooting and Morris was pursuing other women. These pieces of evidence, Morris contends, would have cast doubt on the identification of the passenger of the vehicle as himself. Because the decision not to present these pieces of evidence was a reasonable choice by trial counsel, we agree with the postconviction court and affirm the denial of relief.

First, Morris has not established that trial counsel was ineffective for failing to present the evidence of worthless checks cashed in his name while he was in prison in 2008. Trial counsel testified that they considered an imposter defense to which the checks would have been valuable, but Morris "did not want this type of issue explored at trial." Because trial counsel considered this course of action and ultimately deferred to the defendant's wishes, Morris has not established that counsel was ineffective. *See Occhicone*, 768 So. 2d at 1048 (affirming the postconviction court's denial of ineffective counsel claim where trial counsel testified that they considered presenting the evidence in question and decided against it because they felt they had presented enough evidence to the jury through cross-examination and that closing arguments were more important); *see also Derrick v. State*, 983

So. 2d 443, 460 (Fla. 2008) ("[A] defendant's wishes can be a valid consideration in deciding on an appropriate trial strategy.").

Morris also has not shown that counsel was deficient or that prejudice resulted from trial counsel's cross-examination of Ashley Price, specifically by failing to challenge Price by bringing up her pending child dependency proceedings, financial problems, or violation of probation charge. Morris contends that these pieces of evidence show that Price was predisposed to give in to pressure by TPD to falsely testify against Morris. Various details of these circumstances were already presented to the jury including: (1) the existence of a pending dependency case, (2) Price's financial motive to cooperate with the police, and (3) that Price had been convicted of a felony three times and had an open case. *See Gregory v. State*, 224 So. 3d 719, 733-34 (Fla. 2017) (holding that trial counsel was not deficient for failing to further impeach the defendant's fellow inmates where trial counsel had impeached inmates with prior convictions and reduction of prison exposure based on testimony). Any further impeachment of Price would have been largely cumulative and failing to present cumulative evidence is not ineffective assistance of counsel. *See Card v. State*, 497 So. 2d

1169, 1176 (Fla. 1986) (concluding that counsel was not ineffective for failing to present further evidence of impeachment where counsel had thoroughly cross-examined and attempted to discredit the witness). While trial counsel did testify that she was not aware of some specific details of Price's situation, namely that Price's children were not living with her and the eviction notice on her apartment, trial counsel also testified that her strategy was to discredit Price as a person with whom Morris would have shared a confession, and she attempted to do so. Morris has not demonstrated counsel was ineffective.

As to trial counsel's decision not to call Marcus Oglesby as a witness to rebut testimony as to what Morris was wearing at the time of the murder, Morris has similarly not established deficiency or prejudice. "This Court has . . . consistently held that a trial counsel's decision to not call certain witnesses to testify at trial can be reasonable trial strategy." *Everett v. State*, 54 So. 3d 464, 474 (Fla. 2010) (concluding that a decision to not call a witness based on concern over the witness' credibility was not deficient). As discussed above, trial counsel testified that they considered pursuing an imposter defense, but it was discouraged by Morris.

Further, trial counsel testified that they had concerns over Oglesby's credibility and that his testimony could have been used to corroborate that of Temika Jones, precisely the opposite goal of calling him to testify in the first place. Accordingly, the decision to not call Oglesby was an alternative course chosen for strategic reasons, and Morris has not established deficiency.

Finally, Morris has not proven that counsel was ineffective for failing to present text messages to the jury that allegedly showed that Morris and Cortnee Brantley had broken up so Morris would not have been with Brantley the evening of the murder. The postconviction court determined that trial counsel's testimony that the text messages reflected that Brantley and Morris were just having a "spat" was credible, and there is competent evidence to support that finding. Other text messages from that evening showed Morris and Brantley expressing loyalty to one another. Further, given these other text messages, it seems reasonable for trial counsel not to pursue this argument, and almost certain that the outcome would not have been different were these text messages introduced at trial.

## 2. *Inflammatory Dashcam Footage*

Morris next claims that trial counsel was ineffective during the guilt phase of the trial because they allowed the presentation of the roughly two minutes of dashcam footage that showed other officers attempting to revive the victims but has not established that this decision was deficient performance under *Strickland.* Trial counsel did object to the admission of the entire dashcam video prior to trial. *See Carroll v. State*, 815 So. 2d 601, 613-14 (Fla. 2002) (concluding that trial counsel was not deficient for acquiescing to admission of autopsy photos where trial counsel had objected to most of the autopsy photos). Once part of the dashcam video was shown, trial counsel had strategic reasons for wanting the two minutes in question to be shown to the jury, namely record preservation and to show that the crime scene's integrity was in question. *Cf. Wade v. State*, 156 So. 3d 1004, 1019-20 (Fla. 2014) (holding that trial counsel was not deficient for failing to object to the use of photographs of a codefendant using the victims' bank card because trial counsel made a strategic decision not to object based on the theory that the codefendant alone was responsible for the murder). Because trial counsel made a strategic decision to

allow the full dashcam video to be played for the jury once it was submitted to evidence, we conclude counsel was not deficient.

3. *Use of Racial Slurs*

Morris also claims that trial counsel was ineffective during the guilt phase for failing to object to the use of the racial slur "cracker" 3 times during the trial but has not established prejudice resulting from trial counsel's action. It is not clear that even if trial counsel had filed a motion in limine to exclude the use of the term that it would have been granted. Price's testimony was that Morris used the term "cracker" to describe the men he shot, so the term itself was probative of identifying a victim. The term was further probative of Price's credibility as the race of the officers was not yet released to the public. This Court has previously upheld the admission of testimony including racial slurs attributed to a defendant where the racial slur itself had probative value. *Phillips v. State*, 476 So. 2d 194, 196 (Fla. 1985) (concluding that it would not be error to admit testimony from a fellow inmate where testimony included racial slurs attributed to defendant where testimony discredited defendant's alibi and provided context to an incriminating admission). Moreover, 3 instances of the term

"cracker" used as a descriptor do not inject the kind of racial animus into a trial that would call into question the soundness of the verdict like a trial counsel directly appealing to racial dynamics in the case. *Cf. State v. Davis*, 872 So. 2d 250, 253-54 (Fla. 2004) (finding the soundness of the verdict was in question when trial counsel admitted to his own racial bias in discussing racial prejudice with potential jurors during voir dire). Accordingly, Morris has failed to establish that prejudice resulted from his trial counsel's failure to object to the use of the term "cracker."

*4. November 10, 2011, Jail Visit Video*

Morris next argues that trial counsel was deficient for failing to obtain a working video of a November 10, 2011, jail visit from Morris' mother in which Morris exhibited paranoid behavior and stated he was hearing voices. Shortly after this visit, Morris was put under direct observation. Morris contends failure to submit this video to Dr. McClain resulted in a misdiagnosis of manic depression with temporary psychosis instead of schizophrenia and that failure to present the video to the jury prevented the jury from understanding the context of Morris' statement, "I repent for killing," made under direct observation. However, Morris has not

established that deficiency or prejudice resulted from trial counsel's failure to obtain a copy of this video.

First, Morris has not demonstrated that trial counsel's failure to show a working video to Dr. McClain resulted in prejudice. As the postconviction court noted, Dr. McClain did not testify that the video would have changed her diagnosis or her testimony at trial; she only testified that her "interactions with defense counsel with regard to the issue of competency specifically would have been different" and "further exploration of the potential psychotic disorder and the onset of that would be very important." Further, if Dr. McClain had changed her testimony, it could have been rebutted by additional expert testimony just as it was in the trial and postconviction evidentiary hearing by Dr. Lazarou's testimony. *See Turner v. State*, 143 So. 3d 408, 418 (Fla. 2014) (finding that the second prong of *Strickland* was not satisfied where new mental health expert testimony was undermined by more convincing rebuttal evidence from another mental health expert). Therefore, and especially in light of the evidence shown at trial, Morris has not demonstrated that the outcome of the proceedings would have been different if Dr. McClain had access to this video.

Second, Morris has not demonstrated that trial counsel was deficient for not obtaining a working copy of the jail visit video and showing it to the jury to challenge Morris' statement, "I repent for killing." The trial court had precluded trial counsel from submitting lay or expert testimony of Morris' mental state of mind at the time of this statement, so counsel reasonably concluded that his mental state could not be addressed by providing more evidence from the direct observation records. *Morris*, 219 So. 3d at 42. Further, trial counsel believed that further evidence of the direct observation records would open the door to other prejudicial evidence, for example, Morris describing himself as a "young buck child molester," while under observation. Trial counsel is not deficient for failing to present evidence where he reasonably concludes that evidence may ultimately be more prejudicial. *See Hall v. State*, 212 So. 3d 1001, 1018 (Fla. 2017) (concluding that counsel was not deficient for choosing not to present evidence that could be interpreted by the jury as an attempt to blame the victim because it would be prejudicial). Thus, trial counsel's conclusion that offering this video to the jury would open the door to further bad acts

without actually impeaching the deputy who testified as to Morris' statements was a reasonable strategic decision and not deficient.

*5. Cumulative Effect*

Morris also claims that the cumulative result of the deficiency of his trial counsel and resulting prejudice warrants relief. Because we conclude that counsel's performance during the guilt phase was not deficient, we also reject this claim. Accordingly, because Morris has not demonstrated his counsel acted deficiently during the guilt phase of his trial and prejudice resulted, we affirm the postconviction court's denial of relief with respect to the preceding claims.

**C. Ineffective Assistance of Counsel During the Penalty Phase**

Morris next argues that the postconviction court erred by denying his claim that his trial counsel was ineffective for failing to adequately investigate and present mitigation evidence at the penalty phase of his trial, specifically that trial counsel failed to order a full psychosocial evaluation and obtain key mental health evidence, failed to present all available mental health evidence to the jury, and failed to present evidence of a neurocognitive dysfunction entirely. Because Morris has not established deficiency

or prejudice as required under *Strickland*, we affirm the postconviction court's denial of relief.

"For a defendant to establish that he was prejudiced by trial counsel's failure to investigate and present mitigation, the defendant 'must show that but for his counsel's deficiency, there is a reasonable probability he would have received a different sentence. To assess that probability we consider "the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the [postconviction] proceeding"—and "reweig[h] it against the evidence in aggravation." ' " *England v. State*, 151 So. 3d 1132, 1138 (Fla. 2014) (alterations in original) (quoting *Dennis v. State*, 109 So. 3d 680, 695 (Fla. 2012)). As to the penalty phase in this case, we need not address prejudice, because Morris has not established that trial counsel's performance was deficient.

First, Morris has not shown that trial counsel was deficient for failing to order a full psychosocial evaluation and present evidence related to Morris' family background. Morris relies on the fact that Dr. Richard Cunningham, an expert retained during postconviction proceedings, was able to interview many family members and

present evidence of familial dysfunction that impacted Morris' development during the postconviction proceedings because it shows that evidence could have been obtained by defense counsel. This claim, however, minimizes the fact that Morris was uncooperative during the preparation for the penalty phase and discouraged his family from cooperating as well. Trial counsel, while under a duty to investigate mitigation evidence, is limited by how much evidence a defendant wishes to present and his cooperation with the investigation. *See Simmons v. State*, 105 So. 3d 475, 516-17 (Fla. 2012) (Polston, C.J., concurring in part and dissenting in part) ("Essentially, as the trial court ably explained, we are considering an ineffectiveness of counsel claim 'raised by a Defendant who repeatedly chose to ignore the advice of his qualified lead-counsel and chose—with his family's support—to limit mitigation evidence because it would cast him and/or his family in a negative light.' However, capital defendants have the right to limit the mitigation evidence presented during the penalty phase. *See* [*Boyd v. State*, 910 So. 2d 167, 189-90 (Fla. 2005)].").
Further, this case is not similar to cases in which this Court found a counsel deficient for failing to present mitigation evidence due to

counsel's own neglect or choice not to act because Morris' counsel did attempt to obtain mitigation evidence to present. *See, e.g.*, *Williams v. State*, 987 So. 2d 1, 12-14 (Fla. 2008) (holding that trial counsel was ineffective for failing to present evidence of a mental health expert's report where trial counsel testified that he deemed it unnecessary to present the report to the judge at a *Spencer* hearing because the jury recommended a life sentence, but the judge had a history of overriding jury recommendations). Morris' trial counsel testified that many family members were contacted about testifying or providing statements, but that with few exceptions, none cooperated, and Morris himself was uncooperative in providing information. Despite this, the jury was able to find the existence of 22 mitigating circumstances, most of which related to Morris' upbringing and family. Accordingly, Morris has not demonstrated that trial counsel was deficient for failing to obtain more evidence.

Next, Morris has not demonstrated that trial counsel was deficient for failing to present mental health evidence to the jury. The postconviction court found credible the testimony of trial counsel that both Dr. McClain and Dr. Ingulli had advised that there was a strong likelihood of an antisocial personality disorder

- 31 -

diagnosis and that their opinions might be more harmful than helpful if presented to the jury. This Court has repeatedly held that "defense counsel is entitled to rely on the evaluations conducted by qualified mental health experts." *Hernandez v. State*, 180 So. 3d 978, 1013 (Fla. 2015) (quoting *Stewart v. State*, 37 So. 3d 243, 251-52 (Fla. 2010)). Further, trial counsel did consider presenting mental health evidence to the jury but testified that they were concerned that the evidence would open the door to more negative evidence so decided against it. "Strategic decisions do not constitute ineffective assistance if alternative courses of action have been considered and rejected." *Rutherford v. State*, 727 So. 2d 216, 223 (Fla. 1998) (quoting *State v. Bolender*, 503 So. 2d 1247, 1250 (Fla. 1987)) (holding that trial counsel did not err in deciding not to present mental health mitigation and choosing instead to focus on "humanization" of the defendant); *see also Lebron v. State*, 135 So. 3d 1040, 1065-66 (Fla. 2014) (concluding counsel's decision not to present mental health evidence because it would open the door to unfavorable testimony about defendant's antisocial personality disorder was a reasonable, strategic decision). Accordingly, Morris has not demonstrated deficiency.

Finally, Morris has not demonstrated that trial counsel was deficient for failing to retain an expert to order further neurological tests. Contrary to Morris' statement of events, the postconviction court found credible the testimony of trial counsel that Dr. Ingulli did not express any concerns about Morris' testing results and indicated that there were no signs of brain damage or abnormalities. Trial counsel further had Dr. McClain review Dr. Ingulli's data, and she also concluded that there was no significant mitigation signs of significant brain damage. As discussed above, this Court has repeatedly held that defense counsel is entitled to rely on the reasonable opinions of its experts. *Hernandez*, 180 So. 3d at 1013-14. In *Hernandez*, we rejected a claim that counsel was ineffective for failing to obtain further testing to confirm suspected brain damage where one expert suspected possible brain damage, but another expert was unable to make conclusive findings. *Id.* Here, trial counsel similarly relied on the opinions of two experts who told counsel they saw no signs of significant brain damage. "[T]his Court has repeatedly held that a completely reasonable investigation into mental health mitigation is not rendered unreasonable simply because the defendant has now

obtained the testimony of a more favorable mental health expert."
*Turner*, 143 So. 3d at 417. Thus, Morris has not demonstrated
deficiency as to this claim.

Accordingly, we conclude that Morris has not shown that his
trial counsel was ineffective at the penalty phase of his trial and
affirm the postconviction court's denial of relief.

### D. Cumulative Error

Morris also claims he was denied a fundamentally fair trial
based on the cumulative effect of the errors that occurred. We
disagree. This Court has previously explained that where there is
deficient performance but we reject the individual claim for failure
to show prejudice, we conduct a cumulative review of
postconviction claims. *See Craft v. State*, 45 Fla. L. Weekly S293,
S297, 2020 WL 6788794, at *8 (Fla. Nov. 19, 2020). However,
where there is no deficient performance, there is no need to
consider cumulative prejudice. *Brown v. State*, 304 So. 3d 243, 271
(Fla. 2020) (affirming the circuit court's denial of relief where the
defendant "has failed to show that trial counsel's deficiencies,
individually or cumulatively, establish the prejudice required by
*Strickland*"). Accordingly, because we conclude that trial counsel's

performance was not deficient, we reject Morris' cumulative error claim and affirm the postconviction court's denial of relief.

### E. *Brady*

Finally, Morris claims that the postconviction court erred by summarily denying as procedurally barred his claim that the prosecution withheld a working video of the November 10, 2011, jail visit in violation of *Brady v. Maryland,* 373 U.S. 83 (1963). We disagree and affirm the trial court's denial of relief.

"An evidentiary hearing must be held on an initial 3.851 motion whenever the movant makes a facially sufficient claim that requires a factual determination." *Matthews v. State,* 288 So. 3d 1050, 1060 (Fla. 2019). "A court may summarily deny a postconviction claim when the claim is legally insufficient, procedurally barred, or refuted by the record." *Id.*

First, as the postconviction court accurately noted, the existence of the November 10 video was known to the defense team prior to trial, so the claim is procedurally barred. A *Brady* claim is procedurally barred if the defense knew of the evidence prior to trial and could have addressed the discovery issue then. *See Jimenez v. State,* 265 So. 3d 462, 481-82 (Fla. 2018) (rejecting a *Brady* claim

as procedurally barred where defendant had knowledge of a predeposition interview because it was mentioned in discovery materials and because defense counsel acknowledged the interview during trial). Both parties acknowledge that the State provided Morris with notice of six jail visitation videos in an amended notice of discovery filed in April 2012 but that these videos were unable to be downloaded or viewed due to a technical issue. The defense should have addressed these issues before trial or during trial through a *Richardson*[5] hearing for discovery violations. And in fact, as alleged by Morris in his original motion, trial counsel appears to have acknowledged the nonworking videos during trial preparation. Accordingly, Morris' *Brady* claim is now procedurally barred.

Further, even if Morris' claim was not procedurally barred, it is facially insufficient under *Brady*. "To establish a *Brady* violation, the defendant has the burden to show that: (1) the evidence was either exculpatory or impeaching; (2) the evidence was willfully or inadvertently suppressed by the State; and (3) because the evidence was material, the defendant was prejudiced." *Davis v. State*, 136

---

5. *Richardson v. State*, 246 So. 2d 771 (Fla. 1971).

So. 3d 1169, 1184 (Fla. 2014). However, "[t]here is no *Brady* violation where the information is equally accessible to the defense and the prosecution, or where the defense either had the information or could have obtained it through the exercise of reasonable diligence." *Peede v. State*, 955 So. 2d 480, 497 (Fla. 2007) (quoting *Provenzano v. State*, 616 So. 2d 428, 430 (Fla. 1993)). Morris' motion alleges that defense counsel had notice of the existence of the jail visit videos and knew that they were unable to view the videos. Reasonable diligence would seem to require that defense counsel seek to obtain a working copy of the video after learning that they were unable to download the video. Accordingly, this claim is without merit, and we affirm the postconviction court's summary denial of relief.

### III. CONCLUSION

For the reasons stated above, we affirm the postconviction court's denial of Morris' claims.

It is so ordered.

CANADY, C.J., and POLSTON, LABARGA, LAWSON, MUÑIZ, COURIEL, and GROSSHANS, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Hillsborough County, Michelle Sisco, Judge – Case No. 292010CF010203000AHC

Eric C. Pinkard, Capital Collateral Regional Counsel, Adriana Cristina Corso, Ann Marie Mirialakis, and Nicole Engebretsen, Assistant Capital Collateral Regional Counsel, Middle Region, Temple Terrace, Florida,

   for Appellant

Ashley B. Moody, Attorney General, Tallahassee, Florida, and Marilyn Muir Beccue, Senior Assistant Attorney General, Tampa, Florida,

   for Appellee